## Case No. 7,747.

### KEYS et al. v. The AMBASSADOR.

[1 Bond, 237; [1] 3 Wkly. Law Gaz. 309.]

District Court, S. D. Ohio. Feb. Term, 1859.

COLLISION—RULES OF NAVIGATION—HIGH WATER —CONFLICT OF TESTIMONY.

1. During a high stage of water in the Ohio river, a descending boat should keep near the middle of the river without any regard to the channel.

2. A descending boat on the Ohio river, two hundred yards from the Indiana shore, has no right to signal by one tap of the bell and attempt to take the starboard side of another boat near that shore.

3. The rule requiring the up-stream boat to give the first signal to indicate its choice of sides does not apply when there is eighteen feet of water above the bars.

In admiralty.

Lincoln, Smith & Warnock and S. J. Thompson, for libellants.

Mills & Hoadly, for respondents.

OPINION OF THE COURT. This is a libel in rem against the steamboat Ambassador, prosecuted by Richard W. Keys, Lafayette Maltby, and Nathan Baker, owners of the steamboat Joseph Landis and the barge Blue Dick; and Keys, Maltby & Co., shippers and owners of merchandise on board the said steamboat and barge; and sundry companies who were insurers of portions of the cargo of the barge. The libellants claim damages for the loss of said barge, and for the loss of and injury to the cargo with which it was laden, resulting from a collision with the said steamboat Ambassador. They aver that the collision occurred solely through the fault of those having charge of the boat last named. The respondents insist that it happened wholly through the improper navigation of the Landis. This case has been pending for several years; and there seems to have been no lack of diligence and industry on either side, in procuring testimony to sustain the theory which each party assumes. A great mass of evidence has been taken and submitted to the court. And to those familiar with controversies growing out of marine collisions, it will occasion no surprise to learn, that as to some of the material facts in question, there is a palpable and direct conflict in the evidence. As is usual in all such controversies, each party is anxious to evade censure and responsibility, and each strives with great zeal and pertinacity to prove a state of facts that will most favor their views and interests respectively. From this cause, the duty of a judge required to investigate and pass judicially on the facts involved is often painfully difficult and embarrassing. In the present case, such is the irreconcilable conflict in the testimony of the witnesses as to the course of navigation pursued by

these boats, just prior to the collision, the precise point at which it occurred, and the facts immediately connected with it, that if there were no controlling fact of paramount significance, apart from and not resting on the sworn statements of the witnesses, there would be almost insuperable difficulty in reaching any conclusion. Having very carefully considered all the circumstances brought to the notice of the court by the testimony, I will state the result to which I have been led. There are some facts in this case, either admitted by the parties, or indisputably proved, and about which there can be no controversy. The collision in question occurred between nine and ten o'clock, in the night of January 20, 1854, in that part of the Ohio river known as the Troy Reach, extending from Cannelton, on the Indiana side, and Hawesville, nearly opposite, on the Kentucky side, in a course nearly straight, to the town of Troy, between six and seven miles below. There was a high stage of water at the time, not less than eighteen feet on the shoalest bars along this beach, and it was rapidly rising. The width of the river was between seven and eight hundred yards from shore to shore, and there was sufficient depth of water to permit the safe navigation of either of the boats, without any reference to the channel or deepest portions of the river. The weather was cold, and the night somewhat dark, but not too dark for safe navigation. And the wind was blowing strongly, quartering across from the Kentucky shore.

The Landis had been built and was used exclusively for the transportation of freight. At the time of the collision, this boat was on its way from New Orleans to Cincinnati, with two barges in tow, each one hundred and fifty feet in length; one called the Blue Dick, being on the larboard side—the other, the Black Nose, on the starboard. Each of the barges was made fast to the steamboat by three separate lines, and their bows were forward of the steamer's bow from thirty-five to forty feet. The boat and barges were carrying together about fourteen hundred tons. On the barge Blue Dick there was a cargo of about four hundred tons, consisting of molasses, sugar, scrap iron, glass, and railroad iron. Of the latter, there were between fourteen and fifteen hundred bars on the deck of the barge, arranged in three layers. The draught of the Landis was between eight and nine feet, and its rate of travel about five miles an hour. The Ambassador was a freight and passenger boat on its way from Cincinnati to New Orleans, with a full cargo and a number of passengers. The boat had an empty barge in tow, on the larboard side, one hundred and fifty feet in length, with its bow about fifteen feet aft the bow of the boat. The draught of the Ambassador was seven and a half or eight feet, and its speed from eight to ten miles an hour.

Each of the boats had the complement of

officers and hands usual in the navigation of the western rivers. There is nothing in the evidence materially impeaching the capacity of the master of either boat. The pilot of the Landis, on duty at the time of the collision, was John McFall, who, by the concurring testimony of the witnesses on either side, was a man of mature experience in the navigation of the Ohio and Mississippi, and with the highest reputation as a pilot of intelligence, prudence, and skill. There is evidence that when on shore, or not engaged in actual professional duties, he is addicted to the habit of intoxication; but when in charge of a boat is strictly temperate. In the trip of the Landis now in question, he had not used any intoxicating drink. The pilot of the Ambassador, on duty at the time the collision happened, was Frank Litterell. He was a young man of limited experience, and without an established reputation as a pilot. He seems to have been employed on the Ambassador, in connection with his brother, an older man, and of greater experience, but the evidence is satisfactory that Litterell was reputed to be as skillful and competent as any man of his age and his experience in navigation. There seems to be no reason to doubt that both boats were furnished with the signal lights required by law, and that they were burning, and in good order, when the boats came together. From the general aspect of this collision, it would seem almost incredible that it should have occurred. Everything was favorable to the safe navigation of the boats, at the time, and under the circumstances referred to. And the conclusion is attained, without difficulty, that the occurrence could not have happened, except through some egregious blunder, or some gross disregard of the laws of navigation, on the part of one of these boats, or both. The facts wholly exclude the supposition that the collision, with its disastrous destruction of property, was the result of inevitable accident. It is clear there was great culpability somewhere; and the question to be solved is, on which of the boats rests the responsibility of the fault.

The libellants claim, and have proved by their witnesses, that finding it necessary, and intending to take in a supply of coal at Cannelton, a coaling station on the Indiana side of the river, the pilot of the Landis crossed over from the Kentucky shore, a mile or a mile and a half above Troy, and proceeded up within from forty to seventy-five yards of the Indiana shore for about three miles. In crossing, the boat quartered up stream in the usual way; and while crossing and going up near shore, his view in front of the boat was at times intercepted by the steam and smoke, which were driven forward by the force of the wind. Neither the pilot nor the master, who was on watch at the time, had any knowledge of the approach of a descending boat till apprised of it by one tap of a bell. This was understood as an indication that the down boat would take the Indiana side in passing. When the signal was heard the boats were not more than one hundred or one hundred and fifty yards apart, and a collision was inevitable. The pilot of the Landis replied promptly to the signal by a single tap of his bell, expressing thereby his willingness that the down boat should go inside of the track of his boat if it were practicable. At the same time the helm of the Landis was put hard down, to turn the boat farther out into the river, with the hope that the violence of the expected collision might thereby be lessened; and with this view the pilot simultaneously gave the order for stopping and backing his boat. The headway of the Landis was entirely checked when the boats came together. The descending boat was the Ambassador. All the libellants' witnesses swear the Ambassador came quartering in toward the Indiana shore, and struck the starboard side of the larboard barge of the Landis, near its bow, with such force as to part all the lines by which it was held except that at its stern; and that the barge swung round with its bow toward the Indiana shore, and when nearly round and very soon after receiving the blow it turned over. The railroad iron on deck was thus thrown into the river, and the whole cargo left in the barge, submerged. The barge soon rose to the surface in a reversed position, and after hanging for about two minutes to the boat the line was cut and the barge floated away. It also appears, that immediately after the Landis barge was struck by the Ambassador the starboard barge of the latter boat came in contact with the Ambassador's barge, near its stern, injuring it to such an extent as to render it of no value.

This brief statement indicates the theory of the libellants in regard to the collision in question. They insist that, from the evidence, the Landis was near the Indiana shore, in the proper place of an up-going boat, and that the Ambassador, instead of descending the river near the middle, according to the usages of navigation, was within seventy-five yards of the Indiana shore; and that the collision being the result of this unskillful management of the Ambassador, that boat must be held responsible for the injury sustained by the libellants. On the other hand, the respondents claim that the pilot of the Ambassador, after putting out from Hawesville, was right in shaping out or following the channel of the river; and that, pursuing this course of navigation, his boat was from two to three hundred yards from the Indiana shore, and pointing nearly straight down the river, when the collision took place. They say the Landis did not cross so near as a mile or a mile and a half above Troy, but ran up, on the Kentucky side, nearly opposite to Judge Huntington's and then attempted a crossing in front of the Ambassador, and in such attempt ran in-

to that boat at a point some two or three hundred yards from the Indiana shore, and at least half a mile above Judge Huntington's house. The witnesses for the respondents sustain, by their testimony, this view of the facts. It is obvious that the question of fault, as between these boats, depends greatly, if not wholly, on the precise locality of the collision. If, as claimed by the libellants, it occurred near the Indiana shore—at a distance not exceeding seventy-five yards from it—the conclusion would seem to be inevitable that the Ambassador was out of its proper course as a down-stream boat, and must be held answerable for all the consequences of this error in navigation. On the other hand, if that boat was descending, two hundred yards or more from the Indiana shore, and the collision occurred not less than the distance named from that shore, the inference would be strong that the Landis was out of place, and can have no claim to indemnity for the injury or loss resulting from the collision.

The foregoing statement presents briefly the conflicting theories of these parties. And if the decision of this controversy was wholly dependent on the weight to be given to the testimony of the witnesses on the opposite sides, there would probably be some doubt where the truth lay. Yet, I do not readily perceive on what grounds the testimony of the witnesses for the libellants, as to the course of the Landis after passing Troy, and the facts directly connected with the collision, can be invalidated. The master and pilot of the Landis, with five others who were on the boat, swear that it crossed from the Kentucky side a short distance above Troy, and proceeded up the Indiana shore and very near to it, the whole distance to the point of collision, some two or three hundred yards above Judge Huntington's house, and from forty to fifty yards from the Indiana shore. These witnesses had the best possible opportunities of knowing the facts about which they testify. They were men familiar with the navigation of the river and not liable to be deceived as to distances and the course of navigation. It may also be well presumed, from their positions on the boat, that their attention would be especially directed to the circumstances which they relate. They could not be mistaken as to the place of the boat's crossing, nor as to the fact that it ran up very near the shore. If the witnesses, in their statements, have departed from the truth, they have done so willfully and corruptly, and are guilty of the most deliberate perjury. There is no room for the charitable supposition that they are under any mistake as to the facts about which they swear. It is scarcely necessary to say, in this connection, that these witnesses are sustained by the evidence of Martin. He says he was going down the road running on the river bank to Cannelton the evening of the collision, and when a mile and a quarter below Judge

Huntington's he saw a boat with two barges coming up, about seventy-five yards from the Indiana shore. The witness did not then know what boat it was, but the facts stated by him coming subsequently to his knowledge, leave no room for a doubt that it was the Landis.

The respondents have offered the testimony of several witnesses to disprove the libellants' theory of the collision. Capt. McGowan, the master of the Ambassador, swears, that soon after leaving Hawesville, he went below, and had no intimation of the approach of the boat till he heard the tap of his pilot's bell. He went immediately on deck and there saw a boat—the Landis—quartering across toward the Indiana shore, and so near the Ambassador that he supposed there would be a collision. He states that the pilot of the Ambassador had stopped and backed, and the boat was nearly stationary, pointing straight down the river, when the Landis struck his boat and barge, nearly broadside. He also says that the collision took place two hundred and fifty or three hundred yards from the Indiana shore. Litterell, the pilot of the Ambassador, in his statement, not sworn to, but, by agreement of counsel, received as the ex parte deposition of the witness, says that after rounding out from Hawesville, he "shaped out the channel, and proceeded down about two hundred yards from the Indiana shore." He discovered the lights of a boat coming up on the Kentucky side, which proved to be the Landis. The Landis turned, and steered across from the Kentucky shore, pointing directly toward the Ambassador. The witness then tapped for the Indiana side, and this signal was immediately answered by one tap from the Landis, and the witness then gave his wheel a turn, to throw the boat more to the starboard. The Landis continued to approach, and fearing a collision, the Ambassador was stopped, and had no headway when the boats came together.

Without specially noticing their evidence, it may be remarked that other witnesses connected officially with the Ambassador concur in the statement that the Landis was crossing from the Kentucky shore, at the time of the collision; and, also, that the collision took place from two hundred to three hundred and fifty yards from the Indiana shore. It is also insisted by the respondents, that this view is strongly sustained by persons on shore at the time, who noticed the course and navigation of the boats. The witness, George W. Hutchinson, swears, that, from Judge Huntington's house, and nearly opposite to it, he saw a boat with two barges, going up some fifty or eighty yards from the Kentucky shore, and another boat coming down same distance above, about two hundred yards from the Indiana shore. Shortly afterward there was a collision between the boats, as the witness supposes, nearly opposite Judge Huntington's

house. He also states that the Ambassador landed about one hundred yards below, and the Landis some four hundred yards above the place of collision. The witness Brazee states, that he was in his house, near the bank of the river, and hearing a crash, looked out through a window, and saw the boats near together, more than two hundred yards from the Indiana shore, at a point something less than five hundred yards below. Mrs. Shoulders also saw the boats from her house when near together, two hundred or two hundred and fifty yards out from shore. She thinks the collision occurred some four hundred yards below Mr. Brazee's house. Such are the more general aspects of the material facts in controversy, as presented respectively by the evidence for the libellants and for the respondents. It must be admitted, that as to the course and position of the boats immediately prior to, and at the time of the collision, as well as the subsequent occurrences, the testimony of the opposing parties is widely variant. That of the libellants, if reliable and credible, proves conclusively that the Landis crossed the river a short distance above Troy, and continued up the Indiana shore—from fifty to seventy-five yards from it—to the place of collision, and that as a necessary result the collision occurred near that shore.

On the other hand, if the respondents' witnesses are correct in their estimate of distances, and other matters whereof they testify, the Ambassador's line of navigation was from two hundred to three hundred and fifty yards from the Indiana shore. And again—if the evidence for the libellants is accredited, the collision occurred not exceeding two hundred yards above Judge Huntington's house; whereas, the testimony of respondents' witnesses would locate it nearly a half mile above that point. Under other circumstances, it would perhaps be necessary critically to analyze and compare this conflicting testimony with a view to ascertain in what way the scale of truth would predominate. In such an investigation, the weight of the evidence would not be determined so much by the number of witnesses testifying to any fact in controversy, as by the means and facilities they possessed for a correct observation and knowledge of the fact. And, however conflicting the facts stated by the witnesses may appear, my experience in the trial of cases of collision admonishes me not to be hasty in concluding that witnesses have willfully and corruptly falsified the truth. Under the influence of the excitement produced by a collision, the mind of a spectator, especially if inexperienced in navigation, is not in a state favorable for calm observation of the transaction in question. Witnesses state their impression of the facts as viewed by them from their own stand-point, and often without due knowledge of, or regard to the order of time in which events occurred. And as to distances, so often constituting an important element in these cases, very little consideration is due to the estimate of one not well versed in navigation. At night, and upon the water, nothing can be more deceptive than the distance of one object from another. Even pilots and others, after half a lifetime occupied in practical navigation, know by experience that impressions and opinions on this subject are often wide of the truth.

But, in the present case, I am relieved from the necessity of passing on the material issue presented, from an estimate of the probabilities of truth, based on evidence that is conflicting and uncertain. There is a fact in the case which appeals to the mind almost with the force of demonstration. I refer, of course, to the evidence of the place in the river at which the railroad iron, thrown from the deck of the barge when it capsized, was found. The fact is not disputed, that at a low-water stage of the Ohio river, in the month of September following the date of the collision, this iron was discovered, and the most of it reclaimed from the water at a point very nearly opposite Judge Huntington's house. In the language of a witness who saw it, the iron lay "pretty much in a pile, quartering out into and up the river some eighty or ninety feet, the lower part being within a few feet of the low-water shore." It is, then, a fact, not depending on the speculations or uncertain memories of witnesses, that the barge of the Landis having the railroad iron on its deck was upset at the precise point where the iron was found in the river. It is also certain that at the stage of water at the time of the collision, the distance of that point from the shore did not exceed seventy-five yards. If, therefore, the barge, as proved by the witnesses for the libellants, capsized immediately after the collision, it follows that the boats came together within that distance of the Indiana shore. And assuming this to be the fact, the merits of this controversy depend wholly on the decision of the question whether the pilot of the Ambassador erred in running his boat so near to that shore. If the Landis was in its proper place, it was a great fault in the other boat to be there also. And if the collision was the result of this fault, there can be no difficulty in deciding where the responsibility rests.

On the part of the libellants, it is insisted that the proof is conclusive that after the larboard barge of the Landis was struck by the respondents' boat, and the lines were parted as already noticed, the barge swung round toward the Indiana shore, and upset, while swinging round. This is the statement of Washington, the master, McFall, the pilot, Dobson and Burns, first and second mates, McGroarty, the assistant engineer, and one of the deck-hands. These persons were all on watch when the collision

happened and had the best means of knowing what occurred. One of these witnesses says that the time between the collision and the upsetting of the barge did not exceed two and a half minutes, while the others leave it to be inferred that it was less. They all concur in saying the boat was then very near the Indiana shore. Capt. Washington says that when the barge swung round, he was near the stern of his boat; and that the boat was so near the shore, he thought the barge would strike it in swinging round, and to prevent such a result ordered the pilot to go ahead, and put the boat further out from shore. Dobson, one of the mates, says he was on the barge when swinging round, and jumped from it to the boat, from the apprehension of danger in remaining longer on it. When the barge got nearly round, probably from the effect of the blow, aided by the tension of the stern-line, and the pressure of the water on its side, with the heavy weight of iron on deck, it suddenly turned over, and went under the water, but soon rose in a reversed position. The Landis then, for the purpose of effecting a landing, went ahead some distance, with the barge still in tow, when, by the captain's order, the line was cut, and the barge floated away. This is, in substance, the testimony of the libellants' witnesses as to the time and place of the capsizing of the barge. The facts, as stated by them, bear the impress of truth, and strongly negative any presumption that the occurrences, as sworn to, did not happen. The witness, Buckner, an intelligent lawyer from the South, who was a passenger on the Ambassador, and whose testimony has been taken by the respondents, corroborates the witnesses above referred to. After giving his impression of the position of the boats just after the collision, he says that when they were separated the bow of the Landis was turned across the river, and he then observed the barge float off from the side of the boat; the lines being tightened and raised out of the water—and the barge when apparently some ten or twelve paces from the Landis, capsized and went down instantly. The witness, Hutchinson, states that when he went out after hearing the crash of the collision, the barge was disconnected from the boat, and lying bottom up, very near the shore. It seems clear, that if the barge capsized at any considerable distance from the shore, and was there sent adrift by cutting the line by which it was attached to the boat, it is impossible to account for its being at or very near the shore, as stated by Hutchinson.

There is another fact of great significance, with reference to the upsetting of the barge, and leading to the conclusion that it occurred immediately after the collision. The fact referred to, is the position in which the railroad iron was found in the river. As before remarked, the evidence leaves no room for doubt that it lay quartering up and into the river. This strongly confirms the evidence of the libellants as to the capsizing of the barge. If, as they state, it turned over while swinging round from the boat, and just after it was struck by the Ambassador, the iron would be deposited in the bottom of the river, in the precise position described by the witnesses. Nor is it possible to account for its being so found, upon any other hypothesis than that which I have indicated. It is true the respondents have atempted to show that the upsetting of the barge did not take place for some time after the collision; and that after the collision the Landis went out further into the river, and in making its landing, with the barge in tow, it upset near the shore. It was undoubtedly important for the respondents to prove these facts, and thus to invalidate the evidence of the libellants sustaining their theory. But the proof, as I think, shows beyond controversy, that the barge did upset immediately after it was struck, while swinging toward the shore. And, if the respondents' witnesses are not mistaken in saying they saw the barge in tow of the Landis for some time after the collision, they must have noticed it when hanging to the boat after she upset, in the reversed position described by some of the witnesses for the libellants. It would seem, then, that the evidence fully warrants the conclusion that this collision occurred some two hundred yards above Judge Huntington's house, and not exceeding seventy-five yards from the Indiana shore. It is most obvious that one of the boats was in fault, in being at the point where the collision happened; and the only remaining inquiry is, to which does the fault attach?

A large number of witnesses, experienced in the navigation of the Ohio river, have been examined as to the proper course of a down boat from Hawesville to Troy. There is some difference of opinion on this point, but the weight of evidence sustains the position that in a high stage of water a descending boat should keep near the middle of the river, without any regard to the channel. There can scarcely be a doubt that this course is not only in accordance with the usages of navigation, but sanctioned by reason and common sense. It has been before noticed that the evidence establishes clearly that there was at least eighteen feet of water over all the bars along the Troy Reach. Yet the pilot of the Ambassador, according to his own statement, was shaping out, or following the channel, and he admits he was running within two hundred yards of the Indiana shore at the time of the collision. The river there is more than seven hundred yards wide; and keeping in the middle of the river, or near it, he would have been from three hundred to three hundred and fifty yards from either shore. It was, then, a great error in the pilot of the Ambassador to leave the middle region of the river, in pursuit of the windings

of the channel. It was objectionable as involving unnecessary increase of the distance run, while it added to the chances of collision with ascending boats. And it follows that pursuing this erroneous course of navigation, even if it be conceded that his boat was not nearer than two hundred yards from the Indiana shore, he had no right to signal as he did, by one tap of his bell for that shore. If, as the libellants' witnesses prove, the Landis was near that shore when this signal was given, it was palpably wrong for the pilot of the Ambassador to attempt to take the starboard side. Or, if the truth is as stated by some of the officers on the latter boat, that the Landis was seen quartering across from the Kentucky side, it was the duty of the Ambassador to have passed to the left, and astern of the Landis. Upon either of these suppositions, there was fault in the navigation of the Ambassador, and to that fault the collision in question is clearly to be traced.

It is insisted, however, by the respondents, that the pilot of the Landis, by answering the Ambassador's signal with one tap of the bell, gave his assent to the claim of the latter boat to take the starboard side. It is true, beyond question, that the Landis gave this response to the signal from the other boat. But was it an error or a fault which shall make that boat liable, in whole or in part, for the consequences of the collision? According to the views indicated, the Ambassador was greatly in fault in attempting to follow the channel of the river, and thereby getting near the Indiana shore. The pilot of that boat had, therefore, no right to signal for the starboard side, nor was there any obligation on the ascending boat to respect it. The pilot of the Landis, it is true, did respond to the signal, by one tap of its bell, thereby indicating his willingness that the descending boat should go inside, if it were practicable. Under all the circumstances, I am not able to perceive there was any error in this course. It is conceded in the case, and the fact is proved by the witnesses for both parties, that when the signal was first given by the Ambassador, the boats were so near that a collision was inevitable. The pilot of that boat, pursuant to his signal, was quartering to the Indiana shore; and this accounts for the proximity of that boat to that shore at the time of the collision. The pilot of the Landis, seeing this, very judiciously decided to reply to the signal by one tap of the bell; not thereby admitting the Ambassador's course of navigation was right, nor with the expectation that the collision could thereby be avoided, but with the hope, from the angle at which the boats would come together, that the injury would be less serious. The helm of the Landis was therefore put hard up, the effect of which was to throw the head of the boat quartering to the Kentucky shore. It is clear this movement did not lead to the collision, nor does it imply fault on the part of the pilot of the Landis; especially when viewed in connection with the fact that the order had been promptly given and executed to stop and back the boat.

It is also insisted by the respondents that the pilot of the Landis violated a rule of navigation in not having first given the signal, by two taps of its bell, to indicate which side of the river he wished to take, and that his failure to do so was a palpable fault, sufficient to make the boat liable for all consequences. It is in proof, by the evidence of the pilot of the Landis and others on that boat, that the view from the pilot-house in front of the boat was seriously obstructed by smoke and steam driven forward by the wind, and that he was thus hindered from seeing the descending boat till so near that a collision was certain. It is not necessary to pass on the sufficiency of this excuse. There is another ground on which it is clear the pilot of the Landis is not censurable in the particular referred to. The conclusion has been already stated, that the evidence proves that the Landis had chosen, and was running the Indiana shore in the proper place of an ascending boat when the collision occurred; also that the Ambassador had improperly left the middle of the river, and was, running near that shore, out of its proper place. The ascending boat would not, of course, be on the lookout for a descending boat in such a position, and is not chargeable with negligence in not sooner seeing it and giving the signal for the Indiana shore. The rule requiring the up-stream boat to give the first signal to indicate its choice of sides, does not apply when there is eighteen feet of water above all the bars. The rule must have a rational interpretation, and applies only to a stage of water so low as to make it necessary that both the ascending and descending boats should follow the channel of the river. It has no application when the up boat can safely keep the shore, and the down boat the middle of the river, irrespective of channels. It would be absurd to require the ascending boat, while going up in its proper place near the shore, without any purpose of changing its line of navigation, to announce, formally, by signal, its wish and intention to continue its course. The down boat, seeing the position of the up-stream boat, would conclude, without a signal to that effect, that the pilot intended keeping up the shore. The paramount law of navigation giving the ascending boat either shore, and assigning to the down boat the middle of the river, is not abrogated by a rule intended for a state of facts entirely different from those contemplated by the rule.

But not deeming it necessary to pursue this investigation further. I will state as the result of the views indicated: 1. That there is no sufficient ground for a decree against the libellants for the injury sustained by the Ambassador in this collision, or for a division of the entire damages on the ground of mu-

tual fault in the boats. 2. That the pilot of the Ambassador was in fault in not keeping his boat near the middle of the river, and in running too near the Indiana shore. 3. That, being thus out of place, he had no right to signal for the starboard side, but should have taken the larboard, whereby the danger of collision would have been avoided. 4. That the immediate cause of collision, and the consequent injury to the libellants, is attributable to this faulty navigation of the Ambassador; and that boat must be held liable for the loss and injury resulting from it. The evidence affords the data for ascertaining the amount for which the decree is to be entered, on the basis stated, without a reference to a commissioner. A decree will be entered in accordance with these views for the amount of loss sustained by the libellants, as proved by the testimony.